**COMMONWEALTH of Pennsylvania,**
**Appellee**

**v.**

**David John LETTAU, Appellant.**

Superior Court of Pennsylvania.

Submitted March 10, 2008.
Filed July 10, 2008.
Reargument Denied Sept. 23, 2008.

Charles M. Nedz, Butler, for appellant.

Randa B. Clark, Assistant District Attorney, Butler, for Commonwealth, appellee.

BEFORE: KLEIN, BENDER and POPOVICH, JJ.

OPINION BY BENDER, J.:

¶ 1 David John Lettau appeals the judgment of sentence imposed following his conviction of Forgery and Theft by Receiving Stolen Property, 18 Pa.C.S. §§ 4101(a)(3), 3925 (respectively). Lettau contends that the trial court erred in overruling his objection and denying his motion for mistrial based upon the prosecutor's repeated reference to Lettau's pre-arrest silence during direct examination of the investigating officer and later on Lettau's cross-examination. Lettau contends that the Commonwealth's references were cal-culated to suggest that he refused to cooperate with the police investigation of his case and in so doing implicitly admitted his guilt of the crimes charged. Upon review, we find Lettau's assertions meritorious. Accordingly, we vacate his judgment of sentence.

¶ 2 Lettau's convictions arise out of his negotiation of a check drawn to the order of "Linda McConnell," the proceeds of which he gave to another woman named Linda Krieter. Krieter, in turn, paid the proceeds of the check to Paul Haffley, a member of the Mennonite clergy with whom Krieter lived in a "churchhouse" or co-habitation residence for Mennonite parishioners. Lettau, who is a Baptist minister licensed in pastoral counseling, purportedly encountered both Krieter and Haffley after being assigned by a local social service agency to provide counseling to Haffley after Butler County Children and Youth Services removed Haffley's child. Although Haffley refused Lettau's counseling services, he occasionally relied on Lettau to provide transportation or other favors. Lettau asserted at trial that cashing the check for Linda Krieter was one such favor.

¶ 3 Linda Krieter was never known as Linda McConnell; indeed the two women had never seen or heard of one another and the only link between them was a common first name. The check in question had been sent to McConnell by a second third party, Julie Happe, who intended the funds as a deposit on a puppy she wished to purchase from McConnell. Lettau had no previous knowledge of Linda McConnell or Julie Happe and, according to his testimony at trial, knew Linda Krieter by the common religious designation of "Sister" Linda. Nevertheless, Lettau undertook to cash the check, which was payable for $100 because "Sister Lin-

da" purportedly did not have a checking account of her own.

¶ 4 On May 17, 2006, Lettau drove with Linda Krieter to an office of Next Tier Bank where he had his own account and presented the check for payment. On the back, the check was endorsed with the name of Linda McConnell, below which Lettau wrote his own name and the teller wrote the number of Lettau's drivers license. The teller then gave Lettau $100 cash which he passed to Linda Krieter. Several weeks later, Julie Happe discovered that Linda McConnell had not received the check and, after verifying that the check had been cashed nonetheless, reported the matter to the bank which, in turn, contacted the Pennsylvania State Police.

¶ 5 At trial, the Commonwealth introduced the testimony of both Happe and McConnell as well as that of Trooper Ronald Fagley, who had conducted the police investigation that led to Lettau's arrest. During Fagley's direct examination, the Commonwealth inquired about details of the investigation including the fact that the trooper left multiple messages on Lettau's answering system before receiving a return call and that during their conversation, Lettau had not been forthcoming in response to some of the trooper's questions. After the close of the Commonwealth's case, Lettau presented testimony from Haffley and Krieter, and also testified in his own defense. Lettau asserted that he was not aware the check was stolen and had assumed the "Linda" named as the payee was in fact "Sister Linda" or Linda Krieter. He further asserted had he known of the check's origin, he would not have cashed it.

¶ 6 On cross-examination by the Commonwealth, the prosecutor confronted Lettau with aspects of Trooper Fagley's investigation and attempted repeatedly to secure an admission that Lettau had been knowingly uncooperative, refusing to return telephone calls or provide direct answers to the trooper's questions. After Lettau testified that he had spoken with Fagley multiple times and had cooperated to the best of his ability, the Commonwealth recalled Trooper Fagley as a rebuttal witness. Fagley then testified at length and asserted that Lettau had not been cooperative. The prosecutor then argued in closing that the trooper's testimony of Lettau's lack of cooperation demonstrated the defendant's guilt. *See, e.g.,* N.T, 4/27/07, at 39 ("Why is he preventing this man from doing a full and fair investigation[?] What's that tell you about what the defendant knew, ladies and gentlemen[?]").

¶ 7 Following deliberation, the jury found Lettau guilty as charged, and at sentencing, the court imposed a term of 15 to 30 days incarceration for Forgery coupled with a $300 fine, and a fine of $100 for Receiving Stolen Property. Lettau then filed this appeal, raising the following questions for our review:

I. Did the court err in refusing to sustain an objection concerning the defendant's pre-arrest silence elicited by the Assistant District Attorney?

II. Did the court err in refusing to grant a mistrial after a Commonwealth witness made comment on Defendant's pre-arrest silence?

Brief for Appellant at 4.

¶ 8 Both of Lettau's questions address the underlying legal issue of whether the trial court erred in allowing examination and commentary on Lettau's pre-arrest "silence" under the circumstances of this case. Because Lettau ultimately sought a mistrial, which the trial court refused, we address both of Lettau's questions on appeal under the mantle of the second, *i.e.,*

whether the trial court erred in refusing a mistrial following the disputed testimony.

¶ 9 In criminal trials, declaration of a mistrial serves to eliminate the negative effect wrought upon a defendant when prejudicial elements are injected into the case or otherwise discovered at trial. *See Commonwealth v. Kelly*, 797 A.2d 925, 940 n. 3 (Pa.Super.2002). By nullifying the tainted process of the former trial and allowing a new trial to convene, declaration of a mistrial serves not only the defendant's interest but, equally important, "the public's interest in fair trials designed to end in just judgments." *Id.* (quoting *Illinois v. Somerville*, 410 U.S. 458, 463, 93 S.Ct. 1066, 35 L.Ed.2d 425 (1973)). Accordingly, the trial court is vested with discretion to grant a mistrial whenever "the alleged prejudicial event may reasonably be said to deprive the defendant of a fair and impartial trial." *Commonwealth v. Messersmith*, 860 A.2d 1078, 1092 (Pa.Super.2004) (citing *Commonwealth v. Jones*, 542 Pa. 464, 668 A.2d 491, 503 (1995)). In making its determination, the court must discern "whether misconduct or prejudicial error actually occurred, and if so, ... assess the degree of any resulting prejudice." *Commonwealth v. Sanchez*, 589 Pa. 43, 907 A.2d 477, 491 (2006). Our review of the resulting order is constrained to determining whether the court abused its discretion. *See Messersmith*, 860 A.2d at 1092. "Judicial discretion requires action in conformity with [the] law on facts and circumstances before the trial court after hearing and consideration. Consequently, the court abuses its discretion if, in resolving the issue for decision, it misapplies the law or exercises its discretion in a manner lacking reason." *Bold v. Bold*, 207 Pa.Super. 365, 939 A.2d 892, 895 (2007).

¶ 10 In this case, Lettau argues that the trial court's refusal to grant a mistrial allowed impermissible comment on his "pre-arrest silence," suggesting to the jury that refusal to cooperate fully in a police investigation and to deny the crimes at issue to the investigating officer could be considered as substantive evidence of guilt. Brief for Appellant at 12, 15. The Commonwealth argues to the contrary that its use of the evidence was permissible given that Lettau assumed the stand in his own defense, effectively waiving his Fifth Amendment right against self incrimination and allowing use of his pre-arrest conduct to impeach his credibility. Brief for Appellee at 5. The trial court, in its Rule 1925(a) Opinion, agreed with the Commonwealth, reasoning that "when a criminal defendant waives his right to remain silent and testifies at his own trial, neither the United States nor the Pennsylvania Constitution prohibit a prosecutor from impeaching a defendant's credibility by referring to his pre-arrest silence." Trial Court Opinion, 9/24/07, at 2 (citing *Commonwealth v. DiNicola*, 581 Pa. 550, 866 A.2d 329, 332 (2005); *Commonwealth v. Bolus*, 545 Pa. 103, 680 A.2d 839 (1996)). Upon review, we find the use of Lettau's pre-arrest silence substantially in excess of that sanctioned by *DiNicola* and *Bolus*. Moreover, we agree with Lettau that the Commonwealth's use of the related testimony was so pervasive as to impair the jury's ability to render a fair and just verdict such as to make the grant of a mistrial imperative.

¶ 11 In *Bolus*, the Supreme Court of Pennsylvania addressed the claim of a defendant convicted of theft by receiving stolen property in connection with the removal of a tractor trailer and front-end loader from an out-of-state storage yard and their subsequent discovery by a police investigator at the defendant's towing service. *See Bolus*, 680 A.2d at 840–41. After the investigator first questioned the defendant

concerning his claim to the tractor trailer and found his explanation suspicious, he inquired further into the defendant's possession of the front-end loader. *Id.* at 841. In response, the defendant denied having any knowledge of the loader and, on advice of counsel, refused to cooperate further in the police investigation. *Id.* At trial, the defendant assumed the witness stand in his own defense and testified to a *different version* of the events he had previously related. *Id.* Whereas the defendant previously claimed that he knew nothing of the front-end loader, he asserted at trial that he had purchased it and produced copies of cancelled checks paid to a third party. In response to this inconsistency, the Commonwealth confronted the defendant during cross-examination with his previous denial of knowledge in an effort to impeach his credibility concerning his more recent claim of a lawful purchase. *Id.* at 842.

¶ 12 Ultimately convicted and his conviction affirmed on direct appeal, the defendant later filed a post-conviction petition asserting that his trial counsel rendered ineffective assistance (IAC). In support of his claim, Bolus argued that the Commonwealth's cross-examination concerning his previous denial of knowledge about the front-end loader violated his right to remain silent under the Pennsylvania Constitution as interpreted in *Commonwealth v. Turner*, 499 Pa. 579, 454 A.2d 537 (1982).[1]

Affirming the denial of the post conviction petition, the Supreme Court concluded that *Turner* did not categorically prohibit reference to pre-arrest silence, but instead prevented impeachment on the basis of silence *at the time of arrest* but prior to issuance of *Miranda* warnings. *See Bolus*, 680 A.2d at 843. The Court went on to conclude that use of a defendant's silence *before arrest* would not violate the constitutional protection against self-incrimination so long as the defendant had testified in his own defense. *See id.* The Court reasoned that having taken the stand, the defendant waived the right *to remain silent* and thereafter was subject to impeachment *by his silence* prior to arrest. *See id.* Nevertheless, the most critical aspect of the Court's decision arises not from its decision to allow impeachment of the defendant's credibility on the basis of pre-arrest silence so much as from the circumstances under which the Commonwealth actually used it. *See DiNicola*, 866 A.2d at 337 (recognizing the importance of context to a determination of whether revelation of pre-arrest silence was prejudicial).

¶ 13 In *Bolus*, the defendant first *denied knowledge* and later *asserted specific knowledge* of an element of the offense charged, *i.e.*, the chain of custody by which the stolen front-end loader entered his cus-

1. In *Turner*, our Supreme Court announced its holding as follows:

The prejudice to the defendant resulting from reference to his silence is substantial. While it is efficacious for the Commonwealth to attempt to uncover a fabricated version of events, in light of the "insolubly ambiguous" nature of silence on the part of the accused, *Doyle v. Ohio*, 426 U.S. 610, 617, 96 S.Ct. 2240, 2244, 49 L.Ed.2d 91, 97 (1976), we do not think it sufficiently probative of an inconsistency with his in-court testimony to warrant allowance of any reference at trial to the silence. Accordingly, the Commonwealth must seek to impeach a defendant's relation of events by reference only to inconsistencies as they factually exist, not to the purported inconsistency between silence at arrest and testimony at trial. Silence at the time of arrest may become a factual inconsistency in the face of an assertion by the accused while testifying at trial that he related this version to the police at the time of arrest when in fact he remained silent. *Doyle v. Ohio, Id.* at 619, n. 11, 96 S.Ct. at 2245, n. 11, 49 L.Ed.2d at 98, n. 11. Absent such an assertion, the reference by the prosecutor to previous silence is impermissible and reversible error. *Turner*, 454 A.2d at 539.

tody. To the extent the defendant took the stand and waived his right to silence, he rendered himself subject to impeachment. However, on the facts of the case, the matter subject to impeachment was not in fact "silence," but a flat denial of any knowledge concerning the property being investigated, which he then contradicted with the specific assertion that he had purchased the property. Moreover, the defendant's denial of knowledge and subsequent "recovery" of memory related directly to a material element of the offense, specifically, whether the defendant had knowingly stolen the front-end loader. Accordingly, his pre-arrest denial of knowledge was used to impeach his later testimony concerning that element. Contrary to the facts before us, the defendant's prior "silence" in *Bolus* was not used to suggest an amorphous consciousness of guilt, but instead was used to impeach specific testimony relative to the elements of a specific offense. These distinctions are dispositive. Although they render the decision in *Bolus* inapposite to the facts of the case before us, they also inform our analysis of the manner in which references to pre-arrest silence properly may be used at trial.

¶ 14 The Supreme Court's decision in *DiNicola* echoes its approach in *Bolus*, recognizing that the propriety of references to a defendant's pre-arrest silence is largely a function of the reasons for which the references are made. *See DiNicola*, 866 A.2d at 337–38 ("A consideration of the purpose for which evidence is offered is essential to evaluation of its propriety; thus, evidence which might be prohibited if introduced for one purpose may be relevant and admissible when introduced for another."). Thus, the decision in *DiNicola* allowed reference to the defendant's pre-arrest silence where the defendant

first broached the issue in an offer of proof, after calling the investigating state trooper as a defense witness "to determine the adequacy of the Pennsylvania State Police investigation...." *Id.* at 331. Significantly, *the Commonwealth* objected to the proposed line of questioning on the ground that it would lead the trooper to reveal the defendant's pre-arrest assertion of silence. *See id.* Although the trial judge attempted to dissuade the defense from pursuing its intended strategy, the court ultimately overruled the Commonwealth's objection and defense counsel asked a series of leading questions that implied the trooper's investigation had been minimal and one-sided. *See id.* Among those questions was one exceptionally broad inquiry: "Now, was anything done by you—anything—did you look in any other direction to see if these charges were unfounded?" *Id.* at 332. Predictably, the defendant's expansive questioning threw open a Pandora's Box on cross-examination during which the court afforded the Commonwealth the opportunity to elicit the trooper's explanation that he contacted the defendant and asked to meet with him concerning the allegations, but that the defendant declined the meeting and contacted his attorney.

¶ 15 Relying upon the decision in *United States v. Robinson*, 485 U.S. 25, 33–34, 108 S.Ct. 864, 99 L.Ed.2d 23 (1988), our Supreme Court concluded that the reference to pre-arrest silence of which DiNicola complained was merely a "fair response" to defense arguments that the police had not adequately investigated the charges. *See DiNicola*, 866 A.2d at 336. Although the Court recognized accordingly that the references at issue did not violate the Fifth Amendment as offered,[2]

---

**2.** Due to the limited analysis offered by the    parties, the Court did not conduct a separate

it also reinforced that testimony adduced in "fair response" is subject to assessment by the trial court on the basis of "probative value versus prejudicial effect on appropriate objection, as is the case with all other evidence adduced at trial." *Id.* (citing Pa.R.E. 403). The Court's analysis clarifies the extent to which achievement of the required balance demands vigilance in assuring that evidence of a defendant's silence occurs for limited reasons, *e.g.*, impeachment as in *Bolus* or fair response as in *Robinson*, in a manner and context that do not suggest to the jury that the defendant's silence is a tacit admission of guilt. *See id.* at 337 [3]

¶ 16 In this case, the record bears no semblance of the balance *DiNicola* requires; in point of fact, it documents a persistent line of inquiry by the prosecutor that effectively shredded the defendant's presumption of innocence on no sounder a basis than his refusal to volunteer information to a state trooper. Contrary to the Commonwealth's assertion, the prosecutor first alluded to Lettau's silence and lack of cooperation on direct examination of Trooper Fagley in the following exchange:

Q. Did he say anything [during the telephone interview] relative to the incident?

A. Yes. Prior to my ending the conversation on the telephone, he did state what's the big deal, she got her hundred bucks back, didn't she so what's the problem. Why are you even calling me.

Q. And did you make any effort that could help you locate this Linda?

A. Yes. I asked where his church was located at. At which time he answered in Pennsylvania. And that was the most amount of information I could get pertaining to that.

N.T., 4/26/07, at 71–72.

¶ 17 When Lettau later took the stand in his own defense, his counsel elicited his version of the interview with the trooper, ostensibly to counter the more critical version the jury had already heard from Trooper Fagley. *See id.* at 114–116. In response, the Commonwealth mounted a blistering cross-examination, repeatedly quizzing the witness on Trooper Fagley's version of the telephone interview on every point from the number of times he and the trooper had spoken, to whether Lettau told the trooper of Paul Haffley and Sister Linda and whether he told the trooper Linda's last name. *See id.* at 119–128. In response to each inconsistency between Lettau's testimony and the trooper's account, the Commonwealth challenged the witness to characterize the trooper's statement as a lie. *See id., e.g.,* 120 ("So if Trooper Fagley testifies you never said a word about Paul Haffley to him, he would either be mistaken ... or lying?"); 122 ("So when the trooper testified under oath that you told him that you had no idea where she lived, he either got that wrong or he is lying about that?").

¶ 18 Compounding matters, the Commonwealth recalled Trooper Fagley after the defense rested its case and inquired,

---

inquiry to determine the permissibility of the contested references under the Constitution of Pennsylvania.

3. "Taken at face value, the revelation of silence in this case was limited to its context. The trooper revealed the exchange with Appellee wherein a denial of wrongdoing was immediate, and the decision to engage in further discussion with the trooper was declined. In this situation, the reference to silence and its Fifth Amendment source was circumspect; it was not used in any fashion that was likely to burden Appellee's Fifth Amendment right or to create an inference of an admission of guilt."

once again, about every nuance of his conversation with Lettau. Indeed, the portion of the transcription dedicated to the content of this single telephone conversation exceeds that allowed to develop the events that gave rise to the charges. Whereas examination of all witnesses in the Commonwealth's case in chief (including Trooper Fagley) consumed 23 pages, Trooper Fagley's examination on rebuttal consumed 26 pages. We recognize, of course, that such comparisons are inexact and may not illustrate fully the potential for prejudice, or lack thereof, inherent in the examination. In this case, however, we find it highly probative, as the level of attention accorded the disparities in the witnesses' testimony is so disproportionate to the testimony concerning the charged offenses, as to imply to lay jurors that the offense on trial is in fact the defendant's failure to cooperate more fully with Trooper Fagley. Indeed, even in the presence of a cautionary instruction, which the trial judge did not give, many jurors would be hard-pressed to conclude that the testimony adduced could serve only for impeachment or fair response and was not material to proof of the elements of the underlying offense. We conclude accordingly that this record cleaves much too closely to the very inference of guilt that our Courts have so long struggled to avoid that insistence by an accused in maintaining his silence is in fact a "badge of guilt." *See Turner,* 454 A.2d at 539 (quoting *Commonwealth v. Haideman,* 449 Pa. 367, 296 A.2d 765, 767 (1972)).

¶ 19 We acknowledge our Supreme Court's admonition in *Bolus,* that "when a criminal defendant waives his right to remain silent and testifies at his own trial, neither the United States nor the Pennsylvania Constitution prohibit a prosecutor from impeaching a defendant's credibility by referring to his pre-arrest silence." *Bolus,* 680 A.2d at 844. We acknowledge as well, the privilege of "fair response" espoused by the Court in *DiNicola,* to introduce evidence of a defendant's pre-arrest silence where the defendant has first assailed the fairness of the Commonwealth's investigation. *See DiNicola,* 866 A.2d at 336. Nevertheless, the scenarios at issue in those cases have not recurred here; the limited impeachment conducted in *Bolus,* as discussed, *supra,* is of a very different character and, by comparison, *de minimus.* Similarly, "fair response" under *DiNicola* is not implicated as the Commonwealth first broached the defendant's silence in Trooper Fagley's direct examination. Thus, the context so crucial to application of the rules of law applied in either decision is wholly absent from the record here.

¶ 20 In the absence of the required context, our courts have long insisted that silence in the face of accusation is not a tacit admission. The reason for that distinction, so compelling in our Supreme Court's first iteration over four decades ago, remains no less compelling now:

> It may be desirable and dramatic for the wrongly accused person to shout: 'I am innocent!' but not everybody responds spontaneously to stimuli. The accusation may be so startling that the accused is benumbed into speechlessness. There are persons so sensitive and hurt so easily, that they swallow their tongue in the face of overwhelming injustice.

*Commonwealth v. Dravecz,* 424 Pa. 582, 227 A.2d 904, 907 (1967). In so stating, we do not suggest that the defendant is innocent of the offenses charged, but rather, that the process by which the jury found his guilt was so tainted by pervasive references to pre-arrest silence as to undermine the integrity of the fact finding process. In so doing, it fostered a substantial probability that Lettau was deprived of a fair

and impartial trial. We conclude accordingly that the declaration of a mistrial was imperative, and the trial court's failure in this regard was reversible error. *See Sanchez,* 907 A.2d at 491.

¶ 21 For the foregoing reasons, we vacate Lettau's judgment of sentence and remand this matter for further proceedings consistent with this Opinion.

¶ 22 Judgment of sentence **VACATED.** Case **REMANDED.** Jurisdiction **RELINQUISHED.**

¶ 23 Judge Popovich files a dissenting opinion.

## DISSENTING OPINION BY POPOVICH, J.:

¶ 1 Because I conclude that the trial court did not misapply the holdings of *Bolus* and *DiNicola,* I must respectfully dissent from the Opinion of the learned Majority.

¶ 2 At the outset, I note that the Majority discusses in great detail the testimony offered by Trooper Fagley on direct examination regarding Lettau's lack of cooperation with his investigation and the allusions drawn by the Commonwealth therefrom regarding Lettau's guilty knowledge. Given that the transcript of trial reveals that Lettau failed to object to Trooper Fagley's direct examination testimony, I would find that whatever prejudice that accrued to Appellant from the jury's consideration of this testimony could not be reviewed by this Court. *See Commonwealth v. Elrod,* 392 Pa.Super. 274, 572 A.2d 1229, 1232 (1990) (even issues of constitutional dimension may be waived if not presented to trial court) (citation omitted). Further, my review of the record indicates that Trooper Fagley's direct examination testimony did not indicate that Lettau attempted to remain silent prior to his arrest. In my view, Trooper Fagley's direct examination testimony regarding his conversation with Lettau was limited to the level of cooperation that he provided to Trooper Fagley in the course of his investigation. As such, I would not conclude, as does the Majority, that the testimony of Trooper Fagley "effectively shredded [Lettau's] presumption of innocence on no sounder a basis than his refusal to volunteer information to a state trooper." Majority Opinion, at 12–13.

¶ 3 Based upon my finding that Lettau waived his challenge to Trooper Fagley's direct examination testimony, I would also find that the Commonwealth's attempts to impeach Lettau's credibility with Trooper Fagley's rebuttal testimony were proper pursuant to *Bolus* and *DiNicola.* It is without question that Lettau took the stand in his own defense and, therefore, that he "opened the door" to the possibility that his credibility would be impeached by the Commonwealth's reference to his pre-arrest silence. *See Bolus,* 680 A.2d at 844. In my view, this principle applies with even greater force in the present case because Lettau's direct examination version of the conversation that he had with Trooper Fagley diverged greatly from Trooper Fagley's version and because, on cross-examination, Lettau testified that he was "very cooperative" with Trooper Fagley's investigation. *See* N.T. Trial, 4/26/2007, at 127. Therefore, it is my belief that Lettau's 5th Amendment rights were not violated by the introduction of Trooper Fagley's rebuttal impeachment testimony. *See Bolus,* 680 A.2d at 844; *see also DiNicola,* 866 A.2d at 336.

¶ 4 I also must disagree respectfully with the Majority's characterization of the Commonwealth's impeachment of Lettau on cross-examination, and its subsequent use of Trooper Fagely as a rebuttal witness as "cleav[ing] much too closely to the very inference of guilt that our Courts

have so long struggled to avoid that insistence by an accused in maintaining his silence is in fact a 'badge of guilt.'" *See* Majority Opinion, at 367 (*citing Turner*, 454 A.2d at 539) (*quoting Haideman*, 296 A.2d at 767 (Pa.1972)). In essence, the Majority concludes that the Commonwealth acted so unfairly in concentrating its case on impeaching Lettau's testimony rather than on proving the elements of the offenses charged that it obviated Lettau's presumption of innocence. In my view, this conclusion raises the specter of a violation of Lettau's rights under the 14th Amendment *itself*, not his rights under the 5th Amendment or a combination of the rights secured by the two Amendments under the doctrine of selective incorporation. *See, e.g., Commonwealth v. Colavita*, 920 A.2d 836, 843 (Pa.Super.2007) (explaining that government action that is so fundamentally unfair as to taint fairness of trial violates Due Process Clause of 14th Amendment). Nevertheless, my review of the record indicates that Lettau has failed to present this argument to the trial court or to this Court. Rather, I observe that his arguments sound only in 5th Amendment jurisprudence and his attempts to distinguish *Bolus* and *DiNicola*. Consequently, I would not, as does the Majority, base a finding of trial court error in the present case upon "fundamental fairness" concerns. *See, e.g., Elrod*, 572 A.2d at 1232.

¶ 5 As such, I dissent.