986 A.2d 114

COMMONWEALTH of Pennsylvania, Appellant

v.

David John LETTAU, Appellee.

Supreme Court of Pennsylvania.

Argued Sept. 15, 2009.

Decided Dec. 29, 2009.

438

Mark Andrew Lope, for Commonwealth of Pennsylvania.

Charles Michael Nedz, for David John Lettau.

BEFORE: CASTILLE, C.J., SAYLOR, EAKIN, BAER, TODD, McCAFFERY, GREENSPAN, JJ.

## *OPINION*

Justice GREENSPAN.

In this case, we consider the extent to which evidence of a defendant's pre-arrest silence and lack of cooperation with a police investigation can be used against him when he testifies at trial. Because we determine that evidence of the defendant's pre-arrest lack of cooperation was properly admitted as rebuttal evidence and any argument as to any other use of such evidence was not properly preserved, we reverse the Superior Court.

Appellee David John Lettau ("Lettau") was charged with forgery and theft for cashing a stolen check. Lettau, a minister who is licensed in pastoral counseling, testified at trial in his own defense. Lettau explained that he met Paul Haffley when he was referred by a local social service agency to counsel Haffley after Butler County Children and Youth Services removed Haffley's child. Lettau testified that he had met with Haffley several times at Haffley's home and that he occasionally performed favors for Haffley. Lettau also testified that while visiting Haffley's home, he met a woman named Sister Linda, later revealed to be Linda Krieter, who Haffley described as his cousin. Lettau explained that he soon began to counsel Sister Linda as well. According to Lettau, Haffley asked him to cash a $100 check written to someone named Linda McConnell. Lettau testified that he did not question whether the check belonged to Sister Linda because he did not know her last name. Lettau took Krieter to his bank where he cashed the check and then gave the received funds to Krieter.

In fact, Linda McConnell has no relationship with Lettau, Haffley, or Krieter. McConnell sells dogs, and a customer sent her the check in the mail as a deposit on a puppy. It is unclear how the check came into Haffley's or Krieter's possession—McConnell never received it. When her customer alerted her that the check had been cashed, McConnell let her know that she had not received the check. At that point, McConnell's customer alerted the Pennsylvania State Police that the check had been stolen.

During its case in chief, the Commonwealth called Trooper Ronald Fagley, the investigating officer, to describe his investigation and give brief testimony about conversations he had with Linda McConnell and Lettau during his investigation. Fagley testified that in the course of his investigation he called Lettau and left messages with him, and that Lettau called him back that night. N.T., 4/26/2007, at 70. Fagley said that Lettau told him that he had taken a friend named Sister Linda to the bank to cash a check because she did not have an account there, and that he did not know Sister Linda's last

name. Fagley also testified that Lettau told him that he did not know where Sister Linda lived but that she came to his church on occasion. N.T., 4/26/2007, at 71. According to Fagley, Lettau asked him what the big deal was, because McConnell had gotten her money back. Fagley also testified that Lettau refused to say where his church was located except that it was in the state of Pennsylvania and, in Fagley's words, "that was the most amount of information I could get pertaining to that." N.T., 4/26/2007, at 72.

Lettau testified on direct about his visits to Haffley's residence and his previous interaction with Haffley and Krieter. Lettau explained that he cashed the check as a favor to Haffley and that he was unaware that the check did not belong to Krieter. He also testified that he gave Fagley all of this information about Haffley and Krieter when Fagley contacted him about the check. N.T., 4/26/2007, at 115.

On cross-examination, the Commonwealth focused on Lettau's claim that he had cooperated with the state police investigation. When challenged about his testimony on direct that he had provided the trooper with all of the information he knew about Haffley and Krieter, Lettau insisted that he had relayed this information to police, explaining that he provided the police with contact information for Haffley and Krieter. N.T., 4/26/2007, at 119–21. When the Commonwealth asked Lettau whether he had been asked to come to the police barracks and give a statement, Lettau's trial counsel objected based on Lettau's right to remain silent. The objection was overruled, and the Commonwealth proceeded to question Lettau extensively as to his level of cooperation with Fagley's investigation, eventually eliciting Lettau's testimony that he had cooperated with the investigation. N.T., 4/26/2007, at 127.

The Commonwealth then recalled Fagley to rebut Lettau's testimony. Fagley testified that Lettau had not been cooperative, had refused to provide relevant information about his bank, Krieter, and his church, and had refused to come to the state police barracks in order to give a statement. N.T., 4/26/2007, at 169; 4/27/2007, at 18–19. Defense counsel again objected to Fagley's testimony as to Lettau's refusal to come

to the barracks to give a statement, and moved for a mistrial based on a claim that the Commonwealth made improper use of Lettau's exercise of his right to remain silent. N.T., 4/26/2007, at 170. The trial court heard argument on the issue and denied the mistrial. The Commonwealth continued its cross-examination of Fagley, who contradicted Lettau's testimony regarding his cooperation with the state police. Previously, Fagley had testified that Lettau never mentioned Haffley or any visits to the Haffley residence and his contact with Krieter there. N.T., 4/26/2007, at 71–73. Instead, as Fagley explained earlier in his direct testimony, Lettau maintained that he did not know where Krieter lived but instead encountered her as a visitor to his church. N.T., 4/26/2007, at 71. At the close of trial, the jury found Lettau guilty of Forgery and Theft by Receiving Stolen Property,[1] and the court imposed a sentence of 15 to 30 days incarceration and $400 in fines.

On appeal, the Superior Court vacated Lettau's sentence in a published opinion. *Commonwealth v. Lettau*, 955 A.2d 360 (Pa.Super.2008). Applying this Court's opinions in *Commonwealth v. Bolus*, 545 Pa. 103, 680 A.2d 839 (1996) and *Commonwealth v. DiNicola*, 581 Pa. 550, 866 A.2d 329 (2005), the Superior Court concluded that the Commonwealth's use of Lettau's pre-arrest silence was in excess of what this Court has previously sanctioned and was "so pervasive as to impair the jury's ability to render a fair and just verdict." *Lettau*, 955 A.2d at 363. Judge Popovich dissented, finding that neither *Bolus* nor *DiNicola* warranted reversal and focusing on defense counsel's failure to object to Trooper Fagley's direct testimony.[2]

This Court granted review in order to determine whether the Superior Court was correct in concluding that the Commonwealth's evidence of Lettau's pre-arrest dealings with the

1. 18 Pa.C.S. § 4101(a)(3); 18 Pa.C.S. § 3925.
2. Judge Popovich also disagreed that the majority's opinion was properly grounded in Fifth Amendment, rather than Fourteenth Amendment, jurisprudence, and he concluded that because there was no argument below based on a Fourteenth Amendment due process rationale, such a basis for vacating Lettau's sentence was waived. *Lettau*, 955 A.2d at 368–69.

police unduly prejudiced Lettau, and whether Lettau's trial counsel preserved the essential issues for appellate review. *Commonwealth v. Lettau*, 600 Pa. 103, 963 A.2d 905 (2009).[3]

■ Both the Fifth Amendment of the United States Constitution and Article I, Section 9 of the Pennsylvania Constitution protect an individual's right not to be compelled to be a witness against himself. Article I, Section 9 explicitly allows the use of voluntary admissions for impeachment purposes, and case law under the Fifth Amendment allows a defendant's silence to be used as impeachment evidence when the defendant has testified in his own defense. *See, e.g., Jenkins v. Anderson*, 447 U.S. 231, 100 S.Ct. 2124, 65 L.Ed.2d 86 (1980).[4]

In *Commonwealth v. Bolus, supra,* this Court heard a challenge to a conviction of receiving stolen property, tampering with evidence, and criminal solicitation. Bolus had a stolen tractor-trailer on his property and, when asked during the police investigation how the tractor-trailer got there, he initially told the police that he had towed the tractor-trailer to his towing lot in order to repair it after it had broken down on the highway and that he was in the process of obtaining title via a mechanic's lien. 680 A.2d at 841.

The police found this account difficult to credit, and they seized the tractor-trailer. At that time, they asked Bolus whether he knew the location of the front-end loader, also reported stolen, that the tractor-trailer had been used to transport. Bolus replied that he had no knowledge of the front-end loader's whereabouts. The next day, the police

---

**3.** We granted review on the following two questions:
1. Whether the Superior Court erred in finding that the Respondent was unduly prejudiced by the Commonwealth's evidence of his pre-arrest conduct where his testimony that he cooperated with the police was rebutted by evidence of his lack of cooperation.
2. Whether the Superior Court erred in failing to find that the Respondent waived his claim of undue prejudice by lack of a proper objection at trial.

**4.** In *Jenkins v. Anderson,* the United States Supreme Court held that a defendant who testified at trial that he had killed in self-defense may be impeached with evidence of his failure to report the killing to the police at the time it took place. 447 U.S. at 240–41, 100 S.Ct. 2124.

pulled over a tractor-trailer owned by Bolus and found the stolen front-end loader therein. *Id.*

At trial, Bolus testified that he had purchased the front-end loader from an individual named Willie Thomson. He denied that he knew that the front-end loader was stolen and submitted cancelled checks that were written to Willie Thomson. During cross-examination, the prosecutor asked Bolus why he had not mentioned Willie Thomson in his conversations with the police during their investigation. Defense counsel made no objection to this line of questioning. *Id.* at 842.

Bolus was convicted of receiving stolen property, tampering with physical evidence, and criminal solicitation. On appeal he argued that his trial counsel had been ineffective for failing to object to questions regarding his pre-arrest lack of cooperation with the investigation. This Court denied his claim for relief and applied *Jenkins v. Anderson,* holding that the Fifth Amendment and the Pennsylvania Constitution allow prosecutorial use of pre-arrest, pre-*Miranda*[5] warning silence in order to impeach a defendant who testifies in his own defense. *Id.* at 844.

In *Commonwealth v. Turner,* 499 Pa. 579, 454 A.2d 537 (1982), this Court established that the right to remain silent does not come into existence only when a suspect is induced to remain silent by a *Miranda* warning: "We do not think that the accused should be protected only where there is a government inducement of the exercise of the right [to remain silent]." 454 A.2d at 540. *Bolus* established that although a suspect is protected by the right to remain silent prior to being given *Miranda* warnings, his credibility as a witness may nevertheless be *impeached* with evidence of his pre-*Miranda* silence, especially where he testifies that he was vocal and cooperative with the police investigation. *Bolus,* 680 A.2d at 844 ("We find the reasoning of ... *Jenkins v. Anderson, supra,* to be compelling, and hold that when a criminal defendant waives his right to remain silent and testifies at his own trial, neither the United States nor the

5. *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

Pennsylvania Constitution prohibit a prosecutor from impeaching the defendant's credibility by referring to his prearrest silence."). Notably, in *Bolus*, the defendant professed ignorance as to the stolen front-end loader, and then testified at trial that the front-end loader belonged to him because he purchased it from an individual named Willie Thomson. *Bolus*, 680 A.2d at 841 ("[During the investigation,] Appellant denied having any knowledge regarding the whereabouts of the front-end loader ... [a]t trial, Appellant testified to a different version of events from that which he had previously told the police. Appellant testified that he had purchased the front-end loader.").

In this case, the Superior Court found fault with the extent of the Commonwealth's focus on Lettau's cooperation or lack thereof with the police investigation, especially during its cross-examination of Lettau and subsequent examination of Fagley: "we find it highly probative, as the level of attention accorded the disparities in the witnesses' testimony is so disproportionate to the testimony concerning the charged offenses, as to imply to lay jurors that the offense on trial is in fact the defendant's failure to cooperate more fully with Trooper Fagley." *Lettau*, 955 A.2d at 367. However, there is nothing in *Bolus* or the case law upon which it rests that serves to limit the cross-examination of a defendant who says one thing to police during an investigation and a different thing while testifying at trial. Simply put, impeachment is proper under these circumstances.[6] Similarly, there is no constitutionally-mandated ratio between evidence of the charged offenses and evidence tending to discredit a defendant-witness's credibility.

This case is nearly identical to *Bolus* in that Lettau's interactions with the police were inconsistent with the version of events he testified to at trial. Lettau gave testimony both during his direct examination and on cross-examination that

6. Significantly, defense counsel never objected to the extent of the cross-examination in this case. His single objection during the Commonwealth's cross-examination came after the prosecutor asked if Fagley had asked Lettau to come to the police barracks. The objection was overruled. N.T., 4/26/2007, at 124.

he had cooperated with the police investigation and provided Trooper Fagley specific, relevant information about Haffley and Krieter. For instance, after explaining how he met Haffley and Krieter, including his multiple visits to their residence and the way in which he came to cash the check, Lettau testified that he told Fagley "pretty much the whole scenario we just talked about." N.T., 4/26/2007, at 115. This was in response to a question *from his own attorney* asking him whether he told Fagley that he had taken Linda Krieter to the bank. *Id.* His attorney also asked him whether he told Fagley about Paul Haffley. *Id.* At this point, the Commonwealth offered Fagley's contrary testimony, namely, that Lettau refused to give relevant information about Krieter or about his church, and was not cooperative with Fagley's investigation. N.T., 4/27/2007, at 19.

Under *Bolus*, the Commonwealth must be able to explore the level of the defendant's cooperation and whether he provided the information that he claimed he provided. The proverbial door has been opened. Here, Lettau opened the door by claiming that he gave police extensive information to advance their investigation. As a result, the Commonwealth was entitled to present its version of Lettau's "cooperation."

Contrary to the Superior Court's reasoning, this Court's decision in *Commonwealth v. DiNicola*, 581 Pa. 550, 866 A.2d 329 (2005), lends further support to the trial court's rulings in this case. Under *DiNicola*, when a defendant's claimed participation with a police investigation becomes a subject of defense strategy or defense testimony, the Commonwealth is permitted a fair response to the defendant's claim. Simply put, the Commonwealth may offer up its own accounting of the investigation and the defendant's participation therein. In *DiNicola*, the defense pursued a strategy of impugning the thoroughness of the investigation conducted by the Commonwealth, and in pursuit of that strategy called an investigating officer to testify, asking him whether he had done anything during his investigation to discern whether the charges against the defendant were unfounded. *DiNicola*, 866 A.2d at 332. The defense proceeded with this strategy even after a

Commonwealth objection and warning that it would lead to the officer's revealing the defendant's pre-arrest assertion of his right to remain silent. *Id.* at 331. It did, and the Commonwealth then cross-examined the officer, eliciting testimony that DiNicola had remained silent throughout the investigation, even after he was represented by counsel. *Id.* at 332.

DiNicola filed a post-sentence motion alleging ineffective assistance of counsel, both for failing to object to the investigating officer's reference to his pre-arrest silence and for trial counsel's decision to pursue that line of questioning in the first place, since it was likely to end in the admission of testimony revealing DiNicola's decision to remain silent during the police investigation. *Id.* This Court held that his lawyer was not ineffective for failing to object to testimony of pre-arrest silence, since such testimony was properly admitted under the fair response doctrine.[7] *Id.* at 336. As to DiNicola's second ineffectiveness claim, this Court rejected it because DiNicola could not establish that he had been prejudiced by having evidence of his pre-arrest silence introduced in order to defend the police investigation. "Taken at face value, the revelation of silence in this case was limited to its context ... [i]n this situation, the reference to silence and its Fifth Amendment source was circumspect; it was not used in any fashion that was likely to burden [DiNicola's] Fifth Amendment right

7. The *DiNicola* Court applied the fair response doctrine under *United States v. Robinson*, 485 U.S. 25, 108 S.Ct. 864, 99 L.Ed.2d 23 (1988), wherein the United States Supreme Court ruled that the Fifth Amendment does not bar evidence of defendant's silence in fair response to defense strategy or testimony. The fair response doctrine as laid out in *Robinson* allows prosecutors to refer to a defendant's silence where such a reference is necessary in order to respond to a claim made by the defense. Under the doctrine, prosecutorial comments on a defendant's silence must be examined in context. *Id.* at 33, 108 S.Ct. 864. In *Robinson*, defense counsel claimed during summation that the investigating officers had unfairly denied the defendant the opportunity to explain his actions. In order to counter this claim, the prosecution pointed out that the defendant could have taken the opportunity to testify at trial in order to explain what had happened. Because the prosecutor's comments were made in the context of countering a defense accusation that the investigation had been unfair and the defendant unfairly silenced, and were not intended to suggest that the defendant's silence should be taken as a sign of guilt, they did not violate the Fifth Amendment. *Id.* at 31, 108 S.Ct. 864.

or to create an inference of guilt." *Id.* at 337. "The prosecutor never argued to the jury that [DiNicola's] response to the request for an interview tacitly suggested his guilt; nor did the trial court charge the jurors that they could consider the evidence for such a purpose." *Id.* at 338 (Castille, J., concurring). Because use of the evidence of DiNicola's silence was limited to explaining the extent of the police investigation and defending its thoroughness in the face of defense attacks thereon, this Court held that it was not likely to create an inference of guilt, which the Fifth Amendment is meant to prevent.

■ In this case, Lettau testified that he had been "very cooperative" and had provided Fagley with his side of the story, including all the information he had about Paul Haffley and Linda Krieter.[8] N.T., 4/26/2007, at 115. The purpose of the Commonwealth's cross-examination of Lettau, and its subsequent examination of Fagley, was to show that Lettau had not been truthful in his direct testimony. At no point during its cross-examination of Lettau or its examination of Fagley did the Commonwealth ask the jury to infer that Lettau's silence or lack of cooperation was a sign of guilt. On the contrary, the prosecutor's questions represented a fair response to a defense tactic of portraying Lettau as cooperative, and they further served as rebuttal evidence that called into question Lettau's honesty as a testifying witness. Such impeachment use is clearly allowed under *Bolus* and such fair response use is clearly allowed under *DiNicola*. *See Bolus,* 680 A.2d at 844 (holding prosecutor may impeach a defendant's credibility by referring to his pre-arrest silence); *DiNicola,* 866 A.2d at 336, (holding prosecutor may respond to defense attempts to impugn the thoroughness of the investigation by revealing defendant's lack of cooperation with the investigation).[9] Therefore, Lettau's objections were unfound-

8. Of course, where a defendant talks to police during their investigation, any statements he makes are admissible at trial as admissions.

9. *DiNicola,* like *Bolus,* contains no limits on the proportion of the Commonwealth's fair response evidence to the defendant's evidence.

ed, and were rightfully rejected by the trial court. The Superior Court majority erred in concluding otherwise.

In addition to finding fault with the Commonwealth's cross-examination of Lettau and its proffer of Fagley's rebuttal testimony, the Superior Court majority criticized the Commonwealth's direct examination of Fagley and also noted the prosecutor's closing argument, which it characterized as improperly using Lettau's pre-arrest silence as demonstrating Lettau's guilt.[10] *Lettau,* 955 A.2d at 362. Whether or to what extent Fagley's direct testimony and the Commonwealth's closing argument could be interpreted as improper use of Lettau's pre-arrest silence to establish guilt is irrelevant. Lettau's trial counsel never objected to the trooper's direct testimony or to the prosecutor's closing argument. Thus, the

10. The relevant section of the Commonwealth's closing reads as follows:

The defendant presented the check as though he was authorized to do so. The defendant was not so authorized. **And he knew it. Take a look at what he told the trooper. When he was contacted by the trooper, the defendant made no mention of a Paul Haffley. No mention of a Paul Haffley to the trooper. Think about that.** Trooper Fagley is doing a forgery investigation. **The defendant knows he is the subject of a forgery investigation [and] wouldn't give up the name Paul Haffley. Even on the phone.** Some vague reference to a Linda. Sister Linda who comes to his church some time. He took a friend by the name of Linda to the bank because she needed to cash the check. That's Trooper Haffley or Trooper Fagley's testimony to you about the defendant's statement. This is what the trooper was told by the defendant. That Linda needed to cash the check. Is that what you heard from the defendant[?] Why are you getting two stories[?] The defendant didn't tell the trooper her full name or even her last name. All he said is that they call her Sister Linda. I don't know where she lives is what he said to this man as he is doing a forgery investigation. You know what we heard. He was over there six to eight times, and at the time he was contacted by Trooper Fagley, he knew where she lived. **Why is he preventing this man from doing a full and fair investigation[?] What's that tell you about what the defendant knew, ladies and gentlemen[?]** I don't know where she lives. She comes to church once in a while. Trooper's trying to find out where the church is. Where is it. Pennsylvania. That's all he gets. He doesn't get enough information to follow-up. Doesn't get the name of the church. The defendant didn't say anything more about Linda other than she comes to his church every once in a while and is known as Sister Linda.

N.T., 4/27/2007, at 40 (emphasis added).

Superior Court's discussion of and reliance on alleged improprieties during Fagley's direct testimony and the Commonwealth's closing is misplaced. The Superior Court should have limited its inquiry to the errors Lettau raised at trial and preserved on appeal, namely, Lettau's cross-examination and Fagley's rebuttal testimony.

The dissent also relies on Trooper Fagley's direct testimony as the foundation for its conclusion that the Superior Court decision was correct. The dissent suggests that a single statement made by Trooper Fagley on direct "unmistakably introduced into the trial the notion that [Lettau] refused to participate in the police investigation," which in turn compelled Lettau to "*rebut* such inference by describing his efforts in answering Trooper Fagley's inquiries." [11] Dissenting Opinion at 454, 986 A.2d at 124–25. The dissent concludes that both *Bolus* and *DiNicola* precluded the Commonwealth from thereafter fully cross-examining Lettau about his version of events, as such cross-examination somehow constituted an "exploitation" of Lettau's pre-arrest conduct. *Id.* at 454 n. 2, 986 A.2d at 117 n. 2.

Certainly, if Lettau's counsel believed that the trooper's statement on direct was improper, prejudicial, or objectionable for any reason, he could have raised a challenge. Lettau could have moved to strike the answer; he could have requested a cautionary instruction; he could have sought a mistrial. But, as the dissent recognizes, he pursued none of these options.[12]

11. The relevant testimony was as follows:

Q. [by the prosecution]: And did you make any effort to get any additional information that could help you locate this Linda [meaning Linda Krieter]?
A. [by Trooper Fagley]: Yes. I asked where his church was located at. At which time he answered in Pennsylvania. And that was the most amount of information I could get pertaining to that.
Q. [by the prosecution]: That was the extent of the interview relative to this incident?
A. [by Trooper Fagley]: Yes, sir.

12. It may be that defense counsel saw nothing improper in the trooper's testimony, or refrained from objecting for strategic reasons. Significantly, however, counsel at no time challenged the statement that the dissent characterizes as the triggering event in this matter. Even in his brief to this Court, counsel does not characterize the statement as

The dissent ignores the availability of such traditional methods for curing an asserted "error," and instead proposes the unusual remedy of permitting Lettau to testify about his supposed pre-arrest cooperation with the police without the ramifications that typically accompany sworn testimony in court. Such a "solution," if permitted, would represent a significant departure from our adversary system, as it would allow a witness to testify under oath about material facts, without any expectation or concern that his testimony will be subject to challenge by way of cross-examination or rebuttal. Neither *Bolus* nor *DiNicola* supports such an approach. Indeed, as set out above, the holdings in these cases accomplish just the opposite.

The testimony to which Lettau's trial counsel objected was permissible as impeachment evidence and as fair response to Lettau's characterization of himself as cooperative with the police investigation.

For the foregoing reasons, we reverse the Superior Court.

Chief Justice CASTILLE, Justices EAKIN, TODD, and McCAFFERY join the opinion.

Justice SAYLOR files a dissenting opinion.

Justice BAER files a dissenting opinion.

Justice SAYLOR, dissenting.

Like Mr. Justice Baer, I support the Superior Court's position that the Commonwealth's actions in this case were inappropriate and unduly prejudicial. As Justice Baer presently observes, the district attorney, as an initial matter, elicited testimony implicating Lettau's pre-arrest silence or partial silence in a manner that did not comport with controlling precedent. *See* Dissenting Opinion, at 452–54, 986 A.2d at 124–26 (Baer, J.); *accord Commonwealth v. Lettau,* 955 A.2d 360, 363–67 (Pa.Super.2008) (providing a detailed overview of prevailing case law on the issue and distinguishing the present

improper or inadmissible, let alone as the reason for offering testimony about Lettau's alleged cooperation.

case from prior decisions permitting questioning relative to pre-arrest silence). The Superior Court explained, moreover, that

[w]hen Lettau later took the stand in his own defense, his counsel elicited his version of the interview with the trooper, ostensibly to counter the more critical version the jury had already heard from Trooper Fagley. In response, the Commonwealth ... repeatedly [questioned Lettau] on Trooper Fagley's version of the telephone interview on every point.... In response to each inconsistency between Lettau's testimony and the trooper's account, the Commonwealth challenged the witness to characterize the trooper's statement as a lie.

Compounding matters, the Commonwealth recalled Trooper Fagley after the defense rested its case and inquired, once again, about every nuance of his conversation with Lettau. Indeed, the portion of the transcription dedicated to the content of this single telephone conversation exceeds that allowed to develop the events that gave rise to the charges.

*Id.* at 366–67 (record citations omitted).

I find no fault with the Superior Court's conclusion that, by persistently dwelling upon Lettau's unwillingness to divulge certain information to the police during the pre-arrest time-frame, raising the issue in a manner inconsistent with prevailing fair-response doctrine, and then predicating its ultimate argument for guilt, in large degree, on Lettau's pre-arrest silence in this regard, *see* N.T. Apr. 27, 2007, at 39 ("Why is [Lettau] preventing [the trooper] from doing a fair and full investigation[?] What's that tell you about what [Lettau] knew, ladies and gentlemen[?]"); *see also* Dissenting Opinion, at 452–54, 986 A.2d at 123–24 (Baer, J.) (quoting other portions of the prosecutor's closing argument), the Commonwealth impermissibly burdened Lettau's Fifth–Amendment rights. *Accord Lettau,* 955 A.2d at 367 ("[T]he level of attention accorded the disparities in the witnesses' testimony is so disproportionate to the testimony concerning the charged offenses, as to imply to lay jurors that the offense on trial is in fact the defendant's failure to cooperate more fully with

Trooper Fagley."). Under such circumstances, I agree with Justice Baer and the Superior Court majority that Lettau is entitled to a new trial.

Justice BAER, dissenting.

I respectfully, yet vigorously, dissent from the Majority's conclusion that evidence of Appellee's pre-arrest lack of cooperation was properly admitted as rebuttal evidence because Appellee opened the "proverbial door" "by claiming that he gave police extensive information to advance their investigation." Majority Op. at 445, 986 A.2d at 119. To the contrary, and consistent with the Superior Court's decision herein, my review of the record indicates that it was the Commonwealth who first introduced evidence suggesting that Appellee was uncooperative in the police investigation, and improperly urged the jury to view such conduct as substantive evidence of Appellee's guilt. For these reasons, I conclude that our previous decisions in *Commonwealth v. Bolus*, 545 Pa. 103, 680 A.2d 839 (1996), and *Commonwealth v. DiNicola*, 581 Pa. 550, 866 A.2d 329 (2005), are clearly distinguishable, and the Majority's reliance upon them is misplaced. Additionally, I disagree with the Majority's finding of waiver, and conclude that Appellee properly preserved the specific claims upon which the Superior Court granted him relief.

It is undisputed that Appellee presented for payment a $100 check written to Linda McConnell, and, in doing so, provided the bank teller with his identity as set forth on his driver's license. It is further undisputed that Appellee affixed his own signature on the back of the check underneath the purported signature of McConnell, and that McConnell never actually signed the check or gave Appellee authority to cash the check. The factual issue for the jury to resolve was whether Appellee knew that McConnell's signature had been forged at the time he presented the check for payment, or whether he mistakenly believed that the "Linda" written on the check (Linda McConnell) was the same "Linda" (Linda Krieter) who had accompanied him to the bank.[1]

1. Linda Krieter testified consistent with Appellee's defense that she, in fact, requested him to cash the check upon the direction of Paul Hagley,

A review of the transcript of the very short trial reveals that the Commonwealth relied almost exclusively on Appellee's lack of cooperation in the investigation conducted by Trooper Fagley to prove that he was guilty of the offenses charged, namely, forgery and theft by receiving stolen property. The Commonwealth's method of establishing the elements of such offenses was to demonstrate that Appellee knew the $100 check had been stolen when he presented it for payment; not that Appellee, himself, forged McConnell's signature. *See* N.T. 4/27/2007 at 40 (wherein the prosecutor noted in his closing argument, "And wouldn't we all like to know who actually signed [the check]. Do we need to know retro whether this defendant committed forgery. No. Not at all. That's not something that needs to be proven beyond a reasonable doubt."); *id.* at 41 (wherein the prosecutor stated "So did [Appellee] utter, that means place into circulation, that means present to a teller, that commercial instrument, that check, knowing he was not authorized to do so. That's the forgery."); *id.* at 36 (wherein the prosecutor stated "[Appellee] presented the check as though he was authorized to do so. [Appellee] was not so authorized. And he knew it. *Take a look at what he told the trooper.*") (emphasis added).

While it ultimately holds that Appellee opened the door to his lack of pre-arrest cooperation, the Majority recognizes that in the Commonwealth's case in chief, it called Trooper Fagley to describe his investigation and give testimony about conversations he had with Appellee and the victim during his investigation. Op. at 439–40, 986 A.2d at 115–16. Significantly, the Majority acknowledges that, on direct examination by the Commonwealth, "[Trooper] Fagley also testified that [Appellee] refused to say where his church was located except that it was in the state of Pennsylvania and, in Fagley's words, 'that was the most amount of information I could get pertaining to

and that she accompanied Appellee to the bank when the check was cashed. To the contrary, Paul Hagley testified that he never requested Appellee to cash a check for him. The defense theory was that Paul Hagley, and not Appellee, had committed the forgery and coaxed Appellee into cashing the $100 check for him.

that.' " Op. at 440, 986 A.2d at 116 (citing N.T., 4/26/2007, at 72.).

This statement elicited by the Commonwealth unmistakably introduced into the trial the notion that Appellee refused to participate in the police investigation.[2] It was for this reason that Appellee, when testifying on his own behalf, attempted to *rebut* such inference by describing his efforts in answering Trooper Fagley's inquiries.

Fundamental to my conclusion is that the specific claim upon which the Superior Court granted Appellee relief was based on: (1) the Commonwealth's cross-examination of Appellee; and (2) the Commonwealth's rebuttal testimony of Trooper Fagley, which occurred *after* the Commonwealth had introduced Appellee's pre-arrest silence or lack of cooperation. Further, both of these particular references were met with prompt objections by defense counsel.

On cross-examination of Appellee, the following exchange occurred wherein the Commonwealth was questioning Appellee regarding whether he told Trooper Fagley Linda Krieter's address.

THE COMMONWEALTH: You had been there [Linda Krieter's house] six or eight times, right?

APPELLEE: More than that even by then.

THE COMMONWEALTH: Okay. So you told somebody [where Krieter lived]?

APPELLEE: Someone that was saying they were a State Police, Trooper Fagley.

THE COMMONWEALTH: Oh, and you think that was Trooper Fagley that you told?

APPELLEE: I don't know. All I know is that when I talked I never saw his face, I never knew his voice.

2. I concede that there was no defense objection made to Trooper Fagley's direct examination. This is not fatal to Appellee's claim, however, because he is not contending that Trooper Fagley's direct examination testimony constituted prejudicial evidence that denied him a fair trial. Instead, he is asserting that such reference by Trooper Fagley in the Commonwealth's case in chief in fact opened the door to the subject of his pre-arrest lack of cooperation. Thus, under *Bolus* and *DiNicola*, the Commonwealth could not introduce Appellee's pre-arrest conduct and then proceed to exploit the same in its subsequent cross-examination of Appellee, and again in the rebuttal testimony of Trooper Fagley; the two instances where Appellee promptly objected.

THE COMMONWEALTH: He asked you to come to the barracks, didn't he?

APPELLEE: No, he didn't sir.

DEFENSE COUNSEL: Objection, Your Honor. Request a sidebar.

(Whereupon, a side-bar conference was held.)

N.T. April 26, 2007, at 123–24.

Defense counsel's objection was based upon the Commonwealth's violation of Appellee's absolute right to remain silent by asking him whether he was invited to the police barracks to talk, and refused. The trial court overruled defense counsel's objection.

Thereafter, the Commonwealth presented the rebuttal testimony of Trooper Fagley, whereupon the following exchange took place:

THE COMMONWEALTH: How many times did you try to get ahold of [Appellee] by the phone?

TROOPER FAGLEY: Numerous times. Originally it was probably three or four times before he returned my call.

COMMONWEALTH: And when you spoke with him, did you make inquiry of where, the—where you wanted the interview to be?

TROOPER FAGLEY: Yes. When he originally called back on the 5th of June at approximately 10:30 at night, I did ask him if he wanted to respond to the State Police barracks there in Butler and provide me a statement. He refused to do that. I then asked him, you know, what was his home address, I would come there and take a statement.

DEFENSE COUNSEL: Objection, Your Honor. Request a sidebar.

*Id.* at 169.

Defense counsel's objection was again grounded upon Appellee's Fifth Amendment right to silence, arguing that he was not required to go to the police station and give a written statement. The trial court overruled Appellant's objection and denied his motion for a mistrial.

Accordingly, it is evident that the Commonwealth first introduced the subject of Appellee's lack of cooperation in the police investigation during Trooper Fagley's direct examination in its case in chief; and that Appellee promptly objected when the Commonwealth later exploited that evidence in the cross-examination of Appellee and the rebuttal testimony of Trooper Fagley. These circumstances, when viewed in the context of our decisions in *Bolus* and *DiNicola*, lead me to conclude that the Superior Court was correct in its ruling that the prosecutor's questioning impaired the jury's ability to render a fair and just verdict such as to make the grant of a mistrial imperative.

In *Bolus*, the defendant, an operator of a towing company, was charged with receiving stolen property, namely, a front-end loader. When initially questioned by police prior to arrest, the defendant denied having any knowledge regarding the whereabouts of the front-end loader, and then refused to cooperate with the police. 680 A.2d at 841. At trial, however, the defendant testified to a different version of the events, *i.e.*, that he had purchased the front-end loader from an enumerated individual. *Id.* On cross-examination, the prosecutor questioned the defendant regarding the fact that he never told the officers that he had purchased the front-end loader. *Id.* The claim raised on appeal was whether trial counsel was ineffective for failing to object to the questions concerning the defendant's pre-arrest failure to cooperate in the police investigation.

Our Court ruled in *Bolus* that counsel was not ineffective for failing to object as the claim lacked arguable merit. *Id.* at 844. We relied on *Jenkins v. Anderson*, 447 U.S. 231, 100 S.Ct. 2124, 65 L.Ed.2d 86 (1980), which held that the use of an accused's pre-arrest silence to impeach his credibility on cross-examination when the defendant testifies at trial does not violate the Fifth or Fourteenth Amendments.[3] 680 A.2d at 843.

---

**3.** I emphasize that the High Court in *Jenkins* expressly noted that its decision did not force any state court to allow impeachment through

This case is distinguishable from *Bolus* because here, the Commonwealth initially introduced the evidence of Appellee's lack of cooperation, and did not present such evidence to impeach any testimony of the defendant, as occurred in *Bolus*. In fact, Appellee had not even testified at the point of the trial when Trooper Fagley first remarked on Appellee's failure to cooperate in the investigation. Moreover, the Commonwealth in *Bolus* did not use the defendant's "silence" to suggest consciousness of guilt, as the Commonwealth did in the instant case, but rather used the evidence to impeach specific testimony relative to the elements of the offense charged. The same is not true here.

Our decision in *DiNicola* is likewise distinguishable. There, the defendant was charged with aggravated indecent assault of a minor. Unlike the case at bar where the Commonwealth initially introduced the evidence of the defendant's pre-arrest "silence," the defense in *DiNicola* presented the testimony of the investigating trooper to elicit responses indicating that the police investigation was inadequate. 866 A.2d at 331. The Commonwealth objected, noting that such questioning would lead to the trooper revealing the defendant's pre-arrest assertion of silence. The trial court overruled the objection, and trial counsel proceeded with its direct-examination of the trooper, asking leading questions implying that the investigative efforts were minimal. The Commonwealth again objected, contending that the questioning would open the door to the trooper elaborating on his unsuccessful effort to interview the defendant. The trial court again overruled the objection, but tried to dissuade trial counsel from his intended course. Trial counsel then queried, "Now, was anything done by you—anything—did you look into any other direction to see if these charges were unfounded?" *Id.* at 332. When the trooper responded that he had contacted the defendant, trial counsel interrupted the response, shifting the focus away from the defendant's response to the trooper's inquiry. On cross-

the use of pre-arrest silence, but that each jurisdiction remains free to formulate evidentiary rules defining the situations in which silence is viewed as more probative than prejudicial. 447 U.S. at 240, 100 S.Ct. 2124.

examination, however, the Commonwealth elicited the trooper's explanation that the defendant denied his request for an interview. *Id.*

With new counsel, the defendant challenged trial counsel's ineffectiveness for failing to object to the trooper's reference to his pre-arrest silence, and for opening the door to the inevitable revelation. We held that trial counsel was not ineffective for failing to object to the trooper's reference to the defendant's pre-arrest silence because the Commonwealth's elicitation of such testimony was in "fair response" to the defendant's own questioning. *Id.* at 336. We relied on *U.S. v. Robinson*, 485 U.S. 25, 108 S.Ct. 864, 99 L.Ed.2d 23 (1988), which held that the Fifth Amendment is not violated when the government allows reference to defendant's pre-arrest silence solely for the purpose of fair response to a defense argument. 866 A.2d at 336. As to the claim that counsel was ineffective for opening the door to the revelation, we held that the defendant failed to demonstrate prejudice because the reference was not used in any way that was likely to burden his Fifth Amendment right or to create an inference of guilt. *Id.* at 337.

Here, the Commonwealth did not reference Appellee's pre-arrest conduct as "fair response" to an initial comment made by Appellee, but instead the Commonwealth, itself, initiated the subject and used that evidence to create an inference of guilt. We emphasized in *DiNicola* that a balance must be struck between "probative value versus prejudicial effect on appropriate objection," 866 A.2d at 336. That balance in the instant case weighs in favor of Appellee. As cogently noted by the Superior Court, "[i]n this case, the record bears no semblance of the balance *DiNicola* requires; in point of fact, it documents a persistent line of inquiry by the prosecutor that effectively shredded the defendant's presumption of innocence on no sounder a basis than his refusal to volunteer information to a state trooper." *Commonwealth v. Lettau*, 955 A.2d 360, 366 (Pa.Super.2008).

Accordingly, I would affirm the Superior Court's decision to vacate Lettau's judgment of sentence and grant a new trial.