J-A15036-24

2024 PA Super 207

COMMONWEALTH OF PENNSYLVANIA : IN THE SUPERIOR COURT OF
: PENNSYLVANIA
:
v. :
:
:
:
JESSE JOHN KRZAN :
:
Appellant : No. 1638 MDA 2023

Appeal from the Judgment of Sentence Entered August 22, 2023
In the Court of Common Pleas of Luzerne County Criminal Division at
No(s): CP-40-CR-0003198-2021

BEFORE: DUBOW, J., BECK, J., and STEVENS, P.J.E.[*]

OPINION BY STEVENS, P.J.E.: **FILED SEPTEMBER 12, 2024**

Appellant Jesse John Krzan appeals the judgment of sentence entered by the Court of Common Pleas of Luzerne County after a jury convicted Appellant of rape of an unconscious person[1] and sexual assault.[2] Appellant claims the trial court erred in allowing the Commonwealth to introduce evidence of his pre-arrest silence, refusing to grant him a new trial based on his challenge to the weight of the evidence, and imposing a lifetime sexual offender registration requirement without holding an individualized evidentiary hearing. After careful review, we affirm.

The trial court aptly summarized the factual background of the case as follows:

On March 23, 2021, [Appellant] and M.W., both adults, met on the online platform, "tinder," which [Appellant] characterized

---

[*] Former Justice specially assigned to the Superior Court.
[1] 18 Pa.C.S.A. § 3121(a)(3).
[2] 18 Pa.C.S.A. § 3124.1.

as a "hook-up site." The pair dated for about three (3) weeks. M.W. has a medical condition which apparently causes her to temporarily lose consciousness when her heart rate becomes elevated. [Appellant] was aware of this. At trial, anticipating that his testimony might strain credulity, [Appellant] nonetheless represented that on April 16, 2021, he broke up with M.W. because he wanted to focus on work and because of her medical condition. [Appellant testified that:] "[i]t was uncomfortable towards me and that's why I had to break up with her. [Appellant] was, apparently, terminated from his employment during his short relations with M.W. M.W. testified that they separated amicably because she was leaving school for the summer to return to Maryland. The couples' breakup notwithstanding, the pair remained in contact via social media, apps, or text messages from that time up to the time of the offense on April 29, 2021.

On April 26, 2021, M.W. f[a]inted and hit her head while she was at school. She sustained a concussion during that fall and was excused for several days. A few days later, on April 28, 2021, M.W. sent a "snapchat" notification to [Appellant] sometime between the hours [of] 10:30 PM and 11:00 PM. [Appellant] did not act on the "snapchat" notification for some time while he bowled and drank alcohol with friends at Valley Lanes. Later, in the early morning hours of April 29, 2021, M.W. was alone in her dorm room struggling to sleep and playing on her phone when [Appellant], by now out with friends at Sheetz in Dickson City, responded to her "snapchat" notification.

On direct examination, [M.W.] testified that [Appellant] called her but on cross examination she was unsure who initiated the call. [Appellant] indicated to M.W. that he wanted to check in on her. She spoke with him by phone and they exchanged several messages via "snapchat" throughout the early morning hours. At 4:28 AM, M.W. received the message from [Appellant] indicating that he was on his way and by 5:03 AM he was "outside." [Appellant] was a guest at her dorm at least one time previously shortly after the pair connected on "tinder." M.W. went to the door and let [Appellant] into the building at 5:05 to 5:06 AM.

M.W. testified that [Appellant] appeared to be, "pretty drunk" and he took off his shoes and climbed into her bed. At trial, M.W. testified that she had no intention of engaging in sexual activity with [Appellant] at that time. While in bed, [Appellant] began to profess his love for M.W., telling her that he missed her. He kissed her and reached his hand into her pants. M.W. removed

[Appellant's] hand from her pants, rebuffing his advances, telling him they could discuss their relationship in the morning. Thereafter, she turned over to sleep and apparently f[a]inted. She awakened to [Appellant] lying on top of her. When she awoke, he pulled away and pulled up his pants but not before she saw his penis.

[Appellant] got dressed while M.W. called a friend, David, who advised her that she should call the police. As [Appellant] exited her room, M.W. contacted [Appellant's] brother because she was concerned that he would drive away while he was intoxicated. She was concurrently concerned that [Appellant], having exited her room, would enter the unlocked door of another girl then residing in the dormitory. She located [Appellant], who then protested that he had to go to work. She used her key to let him out of the building.

[Appellant] does not dispute that he went to M.W.'s dormitory early on April 29, 2021. He entered her room and removed his shoes. He made sure that she was hydrated, had access to nutrition and that she took her medication. Then, referencing his innate ability to detect what he characterized as romantic energy, [Appellant] "locked eyes" with M.W. and kissed her. He acknowledged that his hand soon found its way into her pants, and further, that she promptly removed it. Misled by his ability to intuit the desires of others, [Appellant] testified that he apologized for misunderstanding her feelings and that sexual contact ceased at that time.

It is also undisputed that M.W. then became unconscious. The parties' testimony diverged when [Appellant] testified that he did not insert his penis into M.W. but instead testified that she experienced a seizure of some kind before awaking to ask him if he raped her. [Appellant] was indignant; he said, "how could you?" and then he put on his belt and shoes back on.

M.W. called the police and went to the emergency room at Geisinger Medical Center where a sexual assault exam was performed. Detective Robert Odgers Jr. of the Dallas Township Police Department responded to the hospital to meet with her. Evidence collected from M.W.'s sexual assault exam was sent to the Pennsylvania Crime lab for DNA analysis. At trial, Detective Odgers testified that he interviewed M.W. and that he collected DNA pursuant to a warrant from [Appellant]. Noteworthy, his testimony did not reference interviewing [Appellant] or

attempting to interview him. The results of the DNA analysis indicated that Non-sperm DNA matching [Appellant] was recovered from samples taken from M.W.'s vagina and vulva.

Trial Court Opinion (T.C.O.), 2/20/24, at 3-9 (internal citations and footnote omitted).

At the conclusion of the trial, the jury convicted Appellant of both rape of an unconscious person and sexual assault. On August 22, 2023, the trial court sentenced Appellant to not less than sixty months (60) nor more than one hundred and twenty (120) months' incarceration to be followed by three years' consecutive probation. The trial court indicated that Appellant was subject to lifetime sexual offender registration requirements.

On August 29, 2023, Appellant filed a post-sentence motion, which the trial court denied on November 6, 2023. Appellant filed a timely notice of appeal on November 27, 2023 and complied with the trial court's direction to file a concise statement of errors on appeal pursuant to Pa.R.A.P. 1925(b).

Appellant raises the following issues for our review on appeal:

I.  Did the trial court err in holding that the Commonwealth may always introduce evidence that a defendant chose not to speak with the police prior to arrest so long as the defendant testifies at trial even where the evidence would not contradict anything to which the defendant specifically testified and where the evidence is far more prejudicial than probative?

II. Did the trial court abuse its discretion in denying the post-sentence motion for a new trial because the verdict was against the weight of the evidence?

III. Whether the trial court erred in requiring Appellant to register pursuant to SORNA without holding an individualized evidentiary hearing because SORNA's

- 4 -

mandatory, irrebuttable presumptions violate Appellant's right to reputation under the Pennsylvania Constitution?

Appellant's Brief, at 9.

Appellant first claims the trial court erred in allowing the Commonwealth to introduce evidence of Appellant's pre-arrest silence for impeachment purposes.[3] We acknowledge that both the Fifth Amendment of the United States Constitution and Article I, Section 9 of the Pennsylvania Constitution protect an individual's right not to be compelled to be a witness against himself or herself. *See Commonwealth v. Adams*, 39 A.3d 310, 316 (Pa.Super. 2012) (*citing Commonwealth v. Lettau*, 604 Pa. 437, 986 A.2d 114 (2009)).

Consistent with this principle, both federal and Pennsylvania courts have held that the prosecution may not use a defendant's decision to remain silent during the preliminary stages of a criminal investigation as substantive evidence. *See Griffin v. California*, 380 U.S. 609, 615, 85 S.Ct. 1229, 14 L.Ed.2d 106 (1965) (holding that the Fifth Amendment "forbids either comment by the prosecution on the accused's silence or instructions by the court that such silence is evidence of guilt"); *Commonwealth v. Molina*, 628 Pa. 465, 502, 104 A.3d 430, 451 (2014) (plurality) (finding that "Article I, Section 9 is violated when the prosecution uses a defendant's silence whether pre or post-arrest as substantive evidence of guilt").

---

[3] It is undisputed that Appellant is challenging the prosecution's cross-examination of Appellant regarding his decision not to submit to a police interview before his arrest and before he was given any warnings pursuant to *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602 (1966).

However, the United States Supreme Court has held that if a defendant testifies at trial, "the Fifth Amendment is not violated by the use of prearrest silence to impeach a criminal defendant's credibility." ***Jenkins v. Anderson***, 447 U.S. 231, 238, 100 S. Ct. 2124, 2129, 65 L. Ed. 2d 86 (1980). ***See also Commonwealth v. DiNicola***, 581 Pa. 550, 560, 866 A.2d 329, 335 (2005) ("neither the Fifth Amendment nor due process forecloses prosecution use of a defendant's pre-arrest, pre-***Miranda*** silence for purposes of impeachment where the defendant elects to testify at trial") (*citing **Jenkins**, **supra***).

In comparison, the prosecution's ability to use a defendant's pre-arrest silence for impeachment purposes is more limited under Article I, Section 9 of the Pennsylvania Constitution. Our Supreme Court has provided that:

> the Commonwealth must seek to impeach a defendant's relation of events by reference only to inconsistencies as they factually exist, not to the purported inconsistency between silence at arrest and testimony at trial. Silence at the time of arrest may become a factual inconsistency in the face of an assertion by the accused while testifying at trial that he related this version to the police at the time of arrest when in fact he remained silent. Absent such an assertion, the reference by the prosecutor to previous silence is impermissible and reversible error.

***Commonwealth v. Turner***, 499 Pa. 579, 583, 454 A.2d 537, 539–40 (1982).[4]

_____

[4] We acknowledge the Supreme Court's decision in ***Commonwealth v. Bolus***, 545 Pa. 103, 680 A.2d 839 (1996) in which the High Court subsequently held that "when a criminal defendant waives his right to remain silent and testifies at his own trial, *neither the United States nor the Pennsylvania Constitution* prohibit a prosecutor from impeaching a defendant's credibility by referring to his pre-arrest silence." ***Id.*** at 113, 680 A.2d at 844 (emphasis added). The
*(Footnote Continued Next Page)*

As Justice Wecht aptly summarized in his concurrence in *Commonwealth v. Rivera*, 296 A.3d 1141 (Pa. 2023), "in Pennsylvania, a prosecutor may only impeach a testifying defendant if that defendant alleges that his in-trial testimony is consistent with what he told the police earlier. If, in fact, he never spoke to the police, and never provided the police the version he conveyed to the jury, then the prosecutor may reveal to the jury through cross-examination that the defendant had maintained his silence prior to trial." *Id.* at 1167 (Wecht, J., concurring).

Further, our Supreme Court has also held that the prosecution can "use a defendant's pre-arrest silence not only to impeach a defendant's testimony but as fair response to defense arguments." *Commonwealth v. Molina*, 628 Pa. 465, 476, 104 A.3d 430, 436 (2014) (plurality) (*citing* *DiNicola*, 581 Pa. 550, 866 A.2d 329). In other words,

> where a prosecutor's reference to a defendant's silence is a fair response to a claim made by defendant or his counsel at trial, there is no violation of the Fifth Amendment privilege against self-incrimination. *See United States v. Robinson*, 485 U.S. 25, 32, 108 S.Ct. 864, 99 L.Ed.2d 23 (1988) (reference made to defendant's silence at trial was fair because it was a legitimate response to claims made by defendant's counsel). The protective shield of the Fifth Amendment may not be converted into a sword that cuts back on an area of legitimate inquiry and comment by the prosecutor on the relevant aspects of the defense case. *Id.*

---

Supreme Court then clarified in *Commonwealth v. Molina*, 628 Pa. 465, 104 A.3d 430 (2014) (plurality) that its decision in *Bolus* had been decided only on federal grounds. *Id.* at 476, 104 A.3d at 436 n.18 (the defendant in *Bolus* failed to present an argument for distinguishing the protections provided by Section 9 from the federal provisions").

(citing *United States v. Hasting*, 461 U.S. 499, 516, 103 S.Ct. 1974, 76 L.Ed.2d 96 (1983)).

*Commonwealth v. Copenhefer*, 553 Pa. 285, 303, 719 A.2d 242, 251 (1998).

In this case, at the close of the Commonwealth's presentation of evidence, the trial court conducted a colloquy with Appellant to ensure he understood his right to testify on his own behalf. When Appellant expressed his desire to testify at trial, the prosecutor asked for a ruling that Appellant's pre-arrest silence was admissible for the purposes of impeachment. Notes of Testimony (N.T.), 5/23/23, at 249-252.

After the parties were permitted to offer oral argument on this issue and the trial court examined the case law presented by the parties, the trial court stated "[u]pon perusing the case decided, it's not permissible as substantive evidence, but these cases seem to indicate that if a defendant testifies that it would be a fair response for impeachment purposes." N.T. at 251. The trial court ruled that the prosecutor would be permitted to cross-examine Appellant on his pre-arrest silence for the limited purpose of impeachment. N.T. at 251. The trial court also added that it would give a jury instruction that any evidence of Appellant's pre-arrest silence should only be used for impeachment purposes in judging Appellant's credibility. N.T. at 251-52.

Thereafter, on cross-examination, the following exchange occurred between the prosecutor and Appellant when the prosecutor attempted to create a timeline of events in relation to Appellant's employment status:

[Prosecutor:]  Do you recall at what period of your relationship? Was it week one, two, or three that you were fired?

[Appellant:] Probably three, I'm going to say.

[Prosecutor:]  Week three?

[Appellant:]  Yes.

[Prosecutor:]  So when did you get your next job?

[Appellant:]  Summertime when it came through.  That's when actually Mr. Odgers called the – I was at McLain – about all this incident stuff.

[Prosecutor:]  Detective Odgers called you?

[Appellant:]  Yes.

[Prosecutor:]  Why did he call you?

[Appellant:]  *To give me the information of what [M.W.] had told me and all the incident stuff.  He wanted to get my information and meet up with me to do stuff like that.*

[Prosecutor:]  And you never met up with him did you?

[Appellant:]  I did for when he gave me the warrant for the DNA swab.

[Prosecutor:]  Right.  You don't have a choice then.  But prior to that, he asked you to come and set up an appointment with you and you never showed up to give your side of the story; isn't that correct?

[Appellant:]  Yes.

N.T. at 290-91 (emphasis added).

In this exchange, Appellant gave unsolicited testimony that prior to his arrest, Detective Odgers had called to speak about the allegations that the victim had made against him and wanted to meet with Appellant to get his "information."  This misleading testimony created a false impression that Appellant had spoken to the detective before his arrest to relate his version of

the events which was consistent with the testimony he would give at trial. As Appellant never actually provided the police with the account that he presented to the jury, we agree that Appellant's testimony opened the door for the prosecutor to impeach Appellant's credibility with the inconsistency between this testimony and his pre-arrest silence. Moreover, we agree with the trial court that the prosecutor's reference to Appellant's pre-arrest silence was a fair response to Appellant's suggestion that he was forthcoming with information and had met with detectives to give his statement in this case.

Further, we note that the prosecution did not reference Appellant's pre-arrest silence on any other point during testimony or in closing argument. Detective Odgers did not mention at any point that Appellant had declined his request for an interview. The trial court gave the jury an instruction that the fact that Appellant did not speak with the detective before his arrest could not be used as substantive evidence of guilt, but only for the limited purpose of assessing Appellant's credibility. N.T. at 328-29. "It is well settled that the jury is presumed to follow the trial court's instructions[.]" ***Commonwealth v. Lamont***, 308 A.3d 304, 312 (Pa.Super. 2024) (citation omitted).

Appellant argues that the Supreme Court's decision in ***Commonwealth v. Stevenson***, \_\_\_A.3d\_\_\_, 23 EAP 2023, 2014 WL 3490768 (Pa. July 22, 2024) defeats the Commonwealth's argument that Appellant opened the door

to allow the prosecution to impeach him with his pre-arrest silence.[5] However, we find **Stevenson** to be distinguishable from the case at bar.

In **Stevenson**, the defendant proceeded to trial on charges of robbery, burglary, and conspiracy to commit armed robbery. At trial, defense counsel, after notifying the trial court that the defendant had elected to testify on his own behalf, made an oral motion to preclude the prosecution from introducing the defendant's 2005 conviction for burglary on the basis that the conviction was too remote in time. The trial court denied defense counsel's motion and ruled that the conviction was admissible. Thereafter, defense counsel preemptively introduced the conviction by asking the defendant directly about his prior crime on direct examination.

On appeal, a panel of this Court affirmed the defendant's conviction. While this Court did not decide the merits of the defendant's claim that his prior conviction was inadmissible, this Court determined that the defendant had forfeited that claim on appeal by preemptively introducing the prior conviction himself following the trial court's ruling.

However, the Supreme Court reversed, holding that:

> a defendant does not waive his or her right to appellate review of the admissibility of a prior conviction for impeachment purposes under the circumstances presented—i.e., where the defendant preemptively introduces that evidence on direct examination

---

[5] Appellant submitted a "Petition for Permission to File a Post-Submission Communication Pursuant to Pa.R.A.P. 2501(a) and (b)" to notify this Court of the **Stevenson** decision. We grant Appellant's petition, but find the **Stevenson** decision to be inapplicable to our analysis in this case.

> following a trial court's definitive ruling against him on a motion
> in limine.

*Id.* at *12 (Pa. July 22, 2024).

In this case, Appellant argues that this case is analogous to **Stevenson** as the prosecution informed the trial court in an oral motion *in limine* that it intended to impeach Appellant with his pre-arrest silence and the trial court made a ruling that such evidence was admissible for the limited purpose of impeachment.

However, Appellant did not introduce evidence of his pre-arrest silence preemptively in this case and the Commonwealth did not argue that he had waived any challenge to the admission of such evidence. Rather, Appellant gave testimony which created a false impression that he had been forthcoming in giving a statement to police prior to his arrest when he in fact had declined to speak with them altogether.

Based on these facts, we reiterate that the prosecutor's reference to Appellant's pre-arrest silence was a fair response to highlight the factual inconsistency of Appellant's testimony suggesting that he had given police his version of the events in question prior to his arrest when he in fact had remained silent. Appellant cannot use the protections of the Fifth Amendment and Article I, Section 8 as a sword to prohibit the prosecution from making a legitimate inquiry into a relevant defense claim. As such, we conclude that the trial court did not err in permitting the prosecutor to impeach Appellant with his pre-arrest silence.

Appellant also argues that the trial court erred in refusing to grant him a new trial based on his claim that the jury's verdict was against the weight of the evidence. In reviewing such a challenge, we observe the following standard of review:

A motion for a new trial based on a claim that the verdict is against the weight of the evidence is addressed to the discretion of the trial court. **Commonwealth v. Widmer**, 560 Pa. 308, 319, 744 A.2d 745, 751–52 (2000); **Commonwealth v. Brown**, 538 Pa. 410, 435, 648 A.2d 1177, 1189 (1994). A new trial should not be granted because of a mere conflict in the testimony or because the judge on the same facts would have arrived at a different conclusion. **Widmer**, 560 Pa. at 319–20, 744 A.2d at 752. Rather, "the role of the trial judge is to determine that 'notwithstanding all the facts, certain facts are so clearly of greater weight that to ignore them or to give them equal weight with all the facts is to deny justice.'" **Id.** at 320, 744 A.2d at 752 (citation omitted). It has often been stated that "a new trial should be awarded when the jury's verdict is so contrary to the evidence as to shock one's sense of justice and the award of a new trial is imperative so that right may be given another opportunity to prevail." **Brown**, 538 Pa. at 435, 648 A.2d at 1189.

An appellate court's standard of review when presented with a weight of the evidence claim is distinct from the standard of review applied by the trial court:

Appellate review of a weight claim is a review of the exercise of discretion, not of the underlying question of whether the verdict is against the weight of the evidence. **Brown**, 648 A.2d at 1189. Because the trial judge has had the opportunity to hear and see the evidence presented, an appellate court will give the gravest consideration to the findings and reasons advanced by the trial judge when reviewing a trial court's determination that the verdict is against the weight of the evidence. **Commonwealth v. Farquharson**, 467 Pa. 50, 354 A.2d 545 (Pa. 1976). One of the least assailable reasons for granting or denying a new trial is the lower court's conviction that the verdict was or was not against the weight of the evidence and that a new trial should be granted in the interest of justice.

*Widmer*, 560 Pa. at 321–22, 744 A.2d at 753 (emphasis added). *Commonwealth v. Clay*, 619 Pa. 423, 431–32, 64 A.3d 1049, 1054–55 (2013).

Our review of the evidence shows the trial court did not abuse its discretion in denying Appellant's challenge to the weight of the evidence. Although the parties' romantic relationship had ended well before the night in question, Appellant claimed that he came to M.W.'s apartment on that early morning to check on her after she had suffered a concussion from a recent fainting episode at school. Thereafter, when Appellant initiated sexual contact by kissing M.W. and attempting to put his hand down M.W.'s pants, Appellant admitted that he misinterpreted M.W.'s emotions and removed his hand when she rejected his advances and told him to stop. N.T. at 284-85. Appellant denied touching M.W.'s vagina when he had his hand down her pants. N.T. at 285. Appellant apologized to M.W. for missing her "message" that she did not want sexual contact and agreed it was more appropriate to go to sleep and talk about their relationship in the morning. N.T. at 285.

Appellant claimed that while he was laying in M.W.'s bed, she started having a seizure. N.T. at 286. Appellant claimed that when M.W.'s seizure subsided, she accused him of raping her without justification. N.T. at 286. Appellant does not claim M.W. consented to sexual contact, but insisted that sexual contact had never occurred despite M.W.'s suspicions to the contrary. Appellant claimed that on a previous occasion, M.W. had become confused during consensual sexual intercourse as the result of her medical condition.

However, the Commonwealth presented DNA evidence supported M.W.'s version of the facts at issue. Although Appellant denied any suggestion that Appellant had inserted his penis or his finger into her vagina, M.W.'s rape kit examination samples revealed the presence of Appellant's DNA in M.W.'s vagina and labia. M.W. indicated that she believed she had passed out while the parties were in bed; when she regained consciousness, she felt Appellant's penis thrusting inside of her. N.T. at 70, 110. While M.W. did not initially understand what was happening, she observed Appellant's exposed penis when he quickly got up and began to get dressed. N.T. at 71.

While the jury was asked to weigh the testimony of Appellant and M.W., the jury was free to believe M.W.'s testimony and reject Appellant's version of the events. This Court has emphasized that "the trier of fact while passing upon the credibility of witnesses and the weight of the evidence produced, is free to believe all, part or none of the evidence." *Commonwealth v. Andrulewicz*, 911 A.2d 162, 165 (Pa.Super. 2006) (finding that factfinder "was free to accept [the victim's] characterization of what transpired with Appellant, particularly her representation that [the defendant] "raped" her). As such, we conclude that the trial court properly exercised its discretion in denying Appellant's weight of the evidence claim.

Lastly, Appellant argues that the trial court erred in failing to hold an evidentiary hearing on his challenge to his registration under Revised Subchapter H of Pennsylvania's Sexual Offender Registration and Notification Act (SORNA II) based on his claim that SORNA II creates an irrebuttable

presumption of future dangerousness which violates his right to reputation under the Pennsylvania Constitution.

During the pendency of this appeal, our Supreme Court recently filed its decision in ***Commonwealth v. Torsilieri***, 316 A.3d 77 (Pa. 2024) ("***Torsilieri II***"), in which it considered *inter alia* "whether the General Assembly's determination, in [SORNA II], that individuals who commit sexual offenses pose a high risk of committing additional sexual offenses constitutes an unconstitutional irrebuttable presumption violative of due process, because it impairs the right to reputation under the Pennsylvania Constitution." ***Id.*** at 79. The Supreme Court further clarified that:

> [t]he first issue before us concerns a presumption which largely undergirds the criminal justice system's treatment of sex offenders: that those who commit sexual offenses pose a high risk to reoffend. The General Assembly has memorialized this presumption in its legislative findings: "Sexual offenders pose a high risk of committing additional sexual offenses and protection of the public from this type of offender is a paramount governmental interest." 42 Pa.C.S. § 9799.11(a)(4). To challenge such assumptions under the irrebuttable presumption doctrine, a challenging party must demonstrate: (1) an interest protected by the due process clause; (2) utilization of a presumption that is not universally true; and (3) the existence of a reasonable alternative means to ascertain the presumed fact.

***Id.*** (some internal citations omitted).

As the Supreme Court found that parties did not "meaningfully dispute" the first prong of this test (whether the presumption infringed on an interest protected by the due process clause), the Supreme Court focused on the second prong of this test – whether the presumption is universally true. ***Id.***

at 97, n. 13. The Supreme Court emphasized that "to meet his heavy burden of establishing that the General Assembly's presumption was not universally true, Appellee was required to establish that there exists a scientific consensus that sexual offenders pose no greater risk of committing additional sexual crimes than other groups not subject to similar registration laws." *Id.* at 98-99. In evaluating the evidence set forth in the record, the Supreme Court held that:

> Appellee's own experts concede that adult sexual offenders reoffend at a rate of at least three times higher than other individuals convicted of non-sexual offenses. Accordingly, rather than refuting it, the evidence **supports** the legislative presumption; the evidence validates the statutory underpinnings of Subchapter H. We need go no further. Having reviewed the arguments and the evidence presented below, we find that the evidence does not demonstrate a consensus that the presumption at issue is not universally true. Thus, we hold that Appellee has failed to meet his heavy burden to demonstrate that the irrebuttable presumption at issue was constitutionally infirm.

*Id.* at 99-100 (internal citations and footnote omitted) (emphasis in original).[6]

In this case, Appellant argued in his post-sentence motion and appellate brief that this Court should adopt the findings of the trial court in *Torsilieri*, which had found that SORNA II's irrebuttable presumptions violate a registrant's right to reputation and due process. Appellant's mere citation to the trial court's now-overruled decision in *Torsilieri* does not entitle him to an evidentiary hearing. Appellant did not ask for a hearing or request any opportunity to present any evidence to attempt to show the General

---

[6] Given its disposition of the second prong, the Court found it unnecessary to analyze the final prong of the irrebuttable presumption doctrine.

- 17 -

Assembly's presumption was not universally true. Instead, Appellant claimed that he should not have to register under SORNA II as he argues that he "had no prior record, [] will serve five to ten years before being released, [] had overwhelming family and community support, and there is no evidence in the record that he is likely to reoffend." Post-sentence motion, at 25.

Given that our Supreme Court has upheld the General Assembly's presumption that adult sexual offenders pose a high risk of committing additional sexual offenses, Appellant has not shown he is entitled to any relief.

Judgment of sentence affirmed. Application for Post-Submission Communication granted.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date: 09/12/2024